# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Steve Williams, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CD Projekt S.A.,<br><br>Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Steve Williams ("Plaintiff") brings this action on behalf of himself and all others similarly situated against CD Projekt S.A. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on his personal knowledge.

## NATURE OF THE ACTION

1. Defendant, through its subsidiaries, owns and operates its online platform and mobile application, including www.gog.com (the "Website"). Defendant's Website offers a wide array of video games that can be purchased and downloaded on consumers' computers. Unbeknownst to Plaintiff and the Class Members, however, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video game purchased by the user—to unauthorized third parties without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2. Defendant's Website and applications use first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced

Matching and Conversion API, and related tracking tools to purposely track, record, and transmit its digital subscribers' interactions with Defendant's Website.

3. Defendant knowingly installed and used these tools, and it controlled which data was transmitted to unrelated third parties. In conjunction with this, Defendant purposefully and specifically chose to: (1) track and record consumers' viewed video media, (2) disclose that information to Facebook[1] alongside its digital subscribers' individual Facebook ID ("FID") and other persistent identifiers, and (3) did this without its users' knowledge or consent via surreptitious technology.

4. Importantly, when Defendant transmitted Plaintiff's and other consumers' Personal Viewing Information—*i.e.*, their persistent FID and viewed video content—that information was combined and sent to Facebook as one data point, thereby revealing the identity of the individual who requested or viewed a specific video.

5. Because an FID is used to identify a specific individual and their corresponding Facebook account, Facebook or any ordinary person can use it to locate, access, and view a particular digital subscriber's Facebook profile, thereby revealing their identity. Put simply, the information Defendant shares with Facebook reveals each and every video game a particular digital subscriber has viewed or purchased.

6. Plaintiff and consumers were harmed by Defendant's unlawful conduct, which deprives them of their right to privacy in their own homes, and the disclosures at issue reveal highly personal details regarding their unique video requests and viewing habits.

---

[1] Notably, Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

8. This Court also has personal jurisdiction over Defendant because it conducts and transacts business in the state of New York, contracts with vendors to operate its Website within the state of New York, and provides services, including its Website and its sales of digital video games, within the state of New York. Furthermore, this Court has personal jurisdiction over Defendant because its Website collected and disseminated Plaintiff's personally identifiable information giving rise to this lawsuit in this District, and the conduct giving rise to this action arises out of and relates to that business.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## PARTIES

10. Plaintiff Steve Williams is a citizen of New York, who resides in Queens, NY. Plaintiff Williams has had an account with Defendant's Website, which he has used to purchase video games from his computer within the last two years since the filing of this Complaint. Throughout the duration of his interactions with Defendant's Website, Plaintiff Williams has

maintained and used his Facebook account from the same browser that he used to purchase video games from the Website. Pursuant to the systematic process described herein, Defendant sent Plaintiff's Personal Viewing Information to unauthorized third parties—including Facebook—without his knowledge or consent each time he viewed or purchased Defendant's video games through the Website. Plaintiff Williams never gave Defendant express written consent to disclose his Personal Viewing Information to Facebook, or any other unauthorized third party.

11. Defendant CD Projekt S.A. is a publicly traded company incorporated under the laws of Poland with its principal place of business located ul. Jagiellońska 74, 03-301 Warsaw, Poland. Defendant, through its subsidiaries, owns and operates the Website.

## **GENERAL ALLEGATIONS**

### *History and Overview of the VPPA*

12. The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

13. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to

any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

***The VPPA and Video Games***

14. The VPPA covers "prerecorded video cassette tapes or similar audio visual materials," see 18 U.S.C. § 2710(a)(4), and Congress intended that to include materials like "laser discs, open-reel movies, or CDI technology[.]" *See* S. Rep. 100-599.

15. In 1986, "Philips and Sony announced that they were developing standards for a new medium based on the CD and CD-ROM technology."[2] This new format, known as Compact-Disc Interactive, or CD-I, promised to "make it possible to store audio, video, text, computer-generated images, or any combination of these on a compact disc."[3]

16. In 1991, that vision turned into reality. Philips introduced a new console, the Philips CDI 910, which "play[ed] cinema-quality computer games, educational programs, movies, and other multimedia products that combine video, audio and text features in an interactive rather than a play-only mode."[4] The new console played games like "Voyeur," for

---

[2] *See* Scott A. Stewart, *Videodiscs in Healthcare: A Guide to the Industry*, THE MEDICALDISC REPORTER (1990), *archived at* https://tinyurl.com/44ypcaht.
[3] *See* ENCYCLOPEDIA OF LIBRARY AND INFORMATION SCIENCE 98 (1992), *archived at* https://tinyurl.com/mt2vutat.
[4] Patrick Oster, Philips's *Multimedia Makeover; Dutch Electronics Firm Escapes Crisis, but Can It Compete Globally?*, WASH. PO. (Oct. 26, 1994), *archived at* https://tinyurl.com/4xwnausj.

5

example, which was "a kind of high-tech version of Clue[,]" allowing users to "make decisions for characters and even change the outcome of the mystery."[5]

17.     The Philips CDI 910 was initially a joint project between Philips and Sony, but "mounting conflicts resulted in a parting of ways."[6] That would prove advantageous for Sony. The Philips CDI 910 ultimately underperformed, receiving only a lukewarm response from consumers, but "its arrival cemented the CD-ROM as a medium for entertainment beyond the computer[,]"[7] and that same year, Sony unveiled its own console, the "Play Station," which used a CD-ROM drive to "play videogames as well as other forms of interactive entertainment, as was considered important at the time."[8]

18.     Even before CD-I and CD-ROM, however, laser discs were used for video games and other interactive content. As early as 1981, laser discs "permit[ted] the viewer to not only manipulate the programming, but to interact with the material – play games, take quizzes, adjust pacing and repeat sections as desired."[9] During that same period, VHS tapes could also contain interactive content, like the television series "Captain Power and the Soldiers of the Future," which used "video game technology" to create an interactive experience, emitting "a signal, encoded in the television film, that both activates and responds to light rays emitted by the toy – a jet aircraft with a pistol grip – when the user pulls the trigger."[10]

19.     These technologies blurred the line between video games and movies. As one

---

[5] David Elrich, *Interactive Video: Armchair Activities*, N.Y. TIMES (Dec. 9, 1993), *archived at* https://nyti.ms/3Wp2wkZ.
[6] IGN Staff, *History of the PlayStation: The greatest story ever told*, IGN (Jun. 21, 2012), *available at* https://tinyurl.com/25245e9t.
[7] *Id.*
[8] *Id.*
[9] Myron Berger, *High-Tech Equipment Comes of Age*, N.Y. TIMES (Sept. 27, 1981), *archived at* https://tinyurl.com/bnt57hvy.
[10] Sandra Salmans, *The Interactive World of Toys and Television*, N.Y. TIMES (Oct. 4, 1987).

commentator noted, "more and more movies look and sound like video games, and now that more and more video games look and sound like movies, it seems possible that the new art form might well swallow up the old."[11] By 1982, video games were distributed "in the record and video stores[,]"[12] and by 1983, 400 games were in circulation, "including several controversial X-rated games and a game based on the television series 'M-A-S-H,' in which the uplifting goal is to take the most wounded soldier to a hospital."[13]

20. The evolution of interactive content from laser discs and VHS tapes to modern digital platforms has pushed the boundaries of gaming platforms. Today, video games include the same audio-visual materials found in traditional laser discs and VHS tapes that the VPPA seeks to protect.

***Defendant is a Video Tape Service Provider***

21. Defendant is an industry-leading digital distribution platform whose primary business is selling video games, which it offers to millions of users through its www.gog.com (the "Website"). In essence, Defendant is a digital version of obsolete Blockbuster brick-and-mortar stores for classic and modern video game titles.

22. Defendant monetizes this content and its platforms by restricting access for making a purchase to only those who register with Defendant by creating an account on its Website.

23. To subscribe to Defendant's services, at a minimum, individuals must create an

---

[11] Vincent Canby, *Are Video Games About to Zap the Action Movie*, N.Y. TIMES (May 15, 1983*), archived at* https://tinyurl.com/5fv5s6v3.
[12] Aljean Harmetz, *Hollywood Discovering Video Games*, N.Y. TIMES (July 1, 1982), *archived at* https://tinyurl.com/mvcaswf2.
[13] Aljean Harmetz, Makers *Vie for Millions In Home Video Games*, N.Y. TIMES (Jan. 13, 1983), *archived at* https://tinyurl.com/5n84ccc3.

7

online account and share their identifying information through the Website. Thereafter, subscribers can purchase Defendant's video game by using their preferred online payment methods.

***Defendant Knowingly Discloses Consumers' PII To Third Parties***

24. When subscribers browse the available video game library, view trailers for video game titles and make purchases of video games on Defendant's Website, their Personal Viewing Information is transmitted to Facebook, and other unauthorized third parties as a result of tracking tools that Defendant purposely installed and implemented on its Website and application. Defendant controlled its Website, applications, and all of the tracking technologies that it used to transmit its subscribers' Personal Viewing Information to unauthorized parties. Importantly, Facebook would not have received Plaintiff's or other Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API, and other tracking technologies on its Website and applications.

25. Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its subscribers viewed and purchased its video games.

26. Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its digital subscribers' interactions with the Website and applications, including viewing trailers of and purchasing its video game; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the applications.

*Defendant's use of Facebook's Business Tools and Tracking Pixels*

27. Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life. To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

28. Businesses, such as Defendant, use Facebook's Business Tools to monitor and record their website and app visitors' devices and specific activities for marketing purposes.

29. More specifically, the Facebook pixel that Defendant installed and used tracked, recorded, and sent Facebook its subscribers' granular website activity, including the names of specific video games that subscribers requested and/or viewed each time they interacted with the Website. The information is not merely metadata.

30. Defendant's motivation for using the pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services that Defendant would otherwise have to pay for.

31. The information Facebook receives identifies specific subscribers based on their unique and persistent Facebook IDs ("FID"), which is sent to Facebook as one data point alongside the title of the video content the specific subscriber requested or viewed.

32. Notably, these marketing tools are not required for Defendant's Website to function properly. Even if it finds the tools helpful, it could have used them in a manner that does not reveal its subscribers' Personal Viewing Information.

33. Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook

user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

34. At a minimum, Facebook received Plaintiff's Personal Viewing Information as a result of Defendant's data-sharing practices and the tools it installed on its platforms.

*Defendant's Use of Tracking Tools*

35. When a subscriber requests or views a particular video trailer for a video game or purchases a video game, the specific title of the video game is transmitted to Facebook alongside the subscriber's persistent and unique Facebook ID, thereby revealing their Personal Viewing Information to Facebook.

36. However, subscribers are unaware of this because, amongst other things, Defendant's transmissions are completely invisible to ordinary subscribers' viewing its webpages. Figures 1 and 2 are an attempt at lifting the curtain to show exactly what happens behind the scenes when Plaintiff and other subscribers requested, viewed trailers, or purchased video games on Defendant's Website.

37. While Figure 1 shows what ordinary subscribers see on their screens as they use the Website, Figures 2 and 3 show the invisible, behind-the-scenes transmissions taking place.

**[Intentionally Left Black]**





*Figure 1. The images above are screenshots of the title screens that show what subscribers see when they view a trailer or purchase a video game via Defendant's Website. The page does not contain any logos or indications that their interactions are recorded and sent to Facebook.*





*Figure 2. The images above represent screenshots of the network traffic report that was taken when a subscriber viewed a trailer, requested, or purchased a video game via Defendant's Website, at which time the personal viewing information was transmitted to Facebook.*

38. The lines of text embedded in Figure 2 plainly show that Defendant sends Facebook the specific URL assigned to a video game and its trailers with the subscriber's FID (which any person can use to identify a Facebook user) when the user views and purchases video games via the Website, as depicted above.

39. Notably, the URL sent to Facebook also indicates that (1) a user has purchased the video game; (2) the exact ID of the video game; and (3) the exact dollar amount of the transaction.

40. Additionally, Figure 3 below demonstrates that Facebook received Plaintiff's and Class Members' Personal Viewing Information via gog.com and that the data was attributed to specific subscribers' unique Facebook accounts each time they requested video game content.



*Figure 3. Screenshot taken from the user's personal Facebook account.*

41. In addition to the Facebook pixel transmission shown in Figures 2-3 above, Defendant also transmits its subscribers' Personal Viewing Information to Facebook via Conversions API and SDK, and other tracking technologies installed on its website and application.

42. In summary, Defendant discloses information to third parties, like Facebook, that would make it reasonably and foreseeably likely that Facebook could identify which specific user requested, viewed, or purchased any specific video game from Defendant's Website and applications.

43. The personal information Defendants obtained from Plaintiffs and Class Members is valuable data in the digital advertising-related market for consumer information. Because Defendant places advertisements alongside its video game content and embeds commercials within their trailers and marketing of those games, Defendant is incentivized to enhance the "targeting" of such ads, allowing companies who pay Defendant to reach their "ideal" audience.

44. At no point did Plaintiff or the Class Members consent to Defendant's disclosure of their video viewing history to third parties. As such, Defendant deprived Plaintiff and the Class Members of their privacy rights and control over their personal information.

45. The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiffs' and Class Members' personal information, including their private video viewing histories.

## CLASS ACTION ALLEGATIONS

46. Plaintiff brings this action on behalf of herself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, logged in to Defendant's Website or applications and viewed trailers, requested, or purchased video games through the Website using their mobile or computer browsers.

47. The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

48. Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

49. ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

50. ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

51. ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individuals of the Class. These common legal and factual questions

include, but are not limited to:

  (a) Whether Defendant collected Plaintiff's and the Class Members' PII;

  (b) Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

  (c) Whether Defendant's disclosures were committed knowingly; and

  (d) Whether Defendant disclosed Plaintiff's and the Class Members' PII without consent.

52. ***Typicality:*** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, watched videos on Defendant's Website and had her PII collected and disclosed by Defendant to third parties.

53. ***Adequacy***: Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class because he has no interests which are adverse to the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel.

54. Moreover, the proposed Classes can be maintained because they satisfy both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

  (a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

55. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

56. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

57. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—including the video games and associated trailers that Plaintiff and the Class Members requested, purchased or viewed on the Website—and those deliveries affect interstate or foreign commerce.

58. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff and the Class

Members are "consumers" because they purchased, rented, and/or subscribed to Defendant's Website, which provides trailers and video games for sale to users. In so doing, Plaintiff and the Class Members created an account to access Defendant's Website and apps and provided Defendant, at a minimum, their names, emails, addresses, credit card information, and other persistent cookies containing their PII, including the title of the video games that they purchased and/or viewed.

59. Defendant knowingly caused Plaintiff's and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to third parties, including Facebook. This information constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to third parties as individuals who viewed Defendant's video content, including the specific video games viewed, requested, and/or purchased on the Website and apps. This information allowed third parties such as Facebook to identify each Plaintiff's and Class Member's specific video viewing preferences and habits.

60. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer…is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent from Plaintiff and the Class Members under this definition.

61. Defendant was aware that the disclosures to third parties that it shared through the tracking software that it incorporated in its Website and applications identified Plaintiff and the Class Members. Indeed, both Facebook publicly touts their abilities to connect PII to individual

18

user profiles. Defendant also knew that Plaintiff's and the Class Members' Personal Viewing Information was disclosed to third parties because Defendant programmed the tracking software into the Website's and applications' code so that third parties would receive the video titles and subscriber's unique third-party identifiers when a subscriber viewed, requested, or purchased video games through the Website or applications. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook, among other third parties, by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

62. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's and applications' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

63. On behalf of himself and the Class Members, Plaintiff seeks declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c) For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d) For prejudgment interest on all amounts awarded;

(e) For an order of restitution and all other forms of equitable monetary relief; and

(f) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: September 5, 2024

Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC**

By: /s/ Adrian Gucovschi
    Adrian Gucovschi, Esq.

Adrian Gucovschi
Benjamin Rozenshteyn
Nathaniel Haim Sari (*pro hac vice* pending)
140 Broadway, FL 46
New York, NY 10005
Tel: (212) 884-4230
adrian@gr-firm.com
ben@gr-firm.com
nsari@gr-firm.com

*Counsel for Plaintiff and the Class*